**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Ernest Eugene MAHLER, Defendant-
Appellant.**

**No. 26329.**

United States Court of Appeals,
Ninth Circuit.

May 27, 1971.

Rehearing Denied July 9, 1971.

---

Warren E. Haviland, Jr., of Hetter, Glick & Haviland, San Diego, Cal., for defendant-appellant.

Richard K. Burke, U. S. Atty., Stanley L. Patchell, Asst. U. S. Atty., Tucson, Ariz., for plaintiff-appellee.

Before DUNIWAY and ELY, Circuit Judges, and BYRNE,* District Judge.

DUNIWAY, Circuit Judge:

Convicted of travelling from California to Arizona for the purpose of committing extortion (Ariz.R.S. § 13–401), a violation of 18 U.S.C. § 1952(a) (3), Mahler appeals. We affirm.

Mahler's victim had been his paramour, and during their relationship he had taken many photographs of her and of the two of them together. They were of such character that, if seen by others, they could be more than a little damaging to her. At the time of the offense, he was living in a house at Chula Vista, California. She had made the down payment on its purchase. She was living in Tucson, Arizona, in a home that she owned. He found another home in the San Diego area that he wanted to buy, and wrote to her stating that he had been working on a "deal * * * important for you and me." He then drove to Tucson, bringing the photographs with him. He had prepared copies of a reduced size, and had them in a number of envelopes, ready for mailing. In Tucson, he endeavored, without success, to renew their relationship and to persuade her to sell her home and buy the San Diego property. Failing in this, he produced the photographs, including those in the envelopes, and demanded that she address the envelopes to a number of her relatives and friends. He had the names and addresses written on slips of paper for her to copy. He threatened to send the photographs to those people if she did not do as he demanded.

1. *Was the evidence sufficient?*

■ Mahler claims that the jury could not have found that he formed the intent to use the photographs at the time he left Chula Vista or during his trip to Tucson, so that the federal offense was not proved. We have stated the evidence most favorably to the government. It supports an inference that he had the requisite intent before he went to Tucson. The jury did not, and was not required to, accept his version of what happened.

2. *Were the search warrants valid?*

Shortly after the offense, four search warrants were issued, calling for search of (1) the house, outbuildings, a house trailer, and a camper at Mahler's Chula Vista address, (2) a Dodge truck, (3) a Ford station wagon, and (4) a Cadillac sedan. Each car was identified by year and license number. The warrants authorized search for photographs of the victim, the camera, cards bearing the names and addresses of the intended addressees of the envelopes. The search took place, and the photographs, envelopes, cards, and certain other papers were found, including those that Mahler wanted the victim to sign affecting title to her home.

Each warrant was supported by an affidavit of an F.B.I. agent at San Diego, who detailed information received from an F.B.I. agent at Tucson, who got most of his information from the victim. The affidavit identifies the victim by name and address and details the whole sorry story. It must have required considerable fortitude for the victim to have told it. The affidavit stated the location of Mahler's photographic equipment and of the photographs, and gave a description of the Chula Vista home, trailer, camper, and cars. Part of this was confirmed from the California Department of Motor Vehicles. There was also some corroboration of the victim by another woman, who was also fully identified.

■ It is not fatal that the affidavit was a report of a report or reports —*i. e.*, hearsay. Jones v. United States, 1960, 362 U.S. 257, 270–271, 80 S.Ct. 725, 4 L.Ed.2d 697. Nor, when the informant is the victim of the crime, need it be shown by other facts, that she is a reliable informant. Pendleton v. Nelson,

---

* Honorable William M. Byrne, United States District Judge, Central District of California, sitting by designation.

9 Cir., 1968, 404 F.2d 1074, 1075–1076; see also Schnepp v. Hocker, 9 Cir., 1970, 429 F.2d 1096, 1100; Trimble v. United States, 1966, 125 U.S.App.D.C. 173, 369 F.2d 950, 951. Particularly in a case like this, the nature of the offense, and her personal knowledge of it, are self-corroborating. She certainly was an "eye witness" to the crime. See McCreary v. Sigler, 8 Cir., 1969, 406 F.2d 1264, 1269. We have reached a similar result where the informant was a confessed accomplice in the crime. United States v. Mendoza, 9 Cir., 1971, 441 F.2d 1107; Musgrove v. Eyman, 9 Cir., 1971, 435 F.2d 1235, 1238; Louie v. United States, 9 Cir., 1970, 426 F.2d 1398, 1400; Gilbert v. United States, 9 Cir., 1966, 366 F.2d 923, 931. The corroborating information came from another woman, also identified, who spoke from her own knowledge. See Ignacio v. People, 9 Cir., 1969, 413 F.2d 513, 519; Parker v. United States, 9 Cir., 1969, 407 F.2d 540, 542. She also gave some hearsay information, but it was detailed, and of such a character as to make it most unlikely that it was fabricated. The affidavit was more than sufficient.

■ The photographs and papers found can fairly be described as instruments for commission of the offense. But even if, as Mahler asserts, they are "mere evidence," that does not invalidate the search. Warden, Md. Penitentiary v. Hayden, 1967, 387 U.S. 294, 300–310, 87 S.Ct. 1642, 18 L.Ed.2d 782. There is nothing in Mahler's claim that seizure of his papers violated his privilege against self-incrimination.

### 3. *Was the offense a federal offense?*

■ Clearly, it was. The pertinent part of 18 U.S.C. § 1952(a) makes it an offense to travel in interstate commerce "with intent to * * * promote, manage, establish, carry on * * * any unlawful activity." And it defines as an "unlawful activity" "extortion * * * in violation of the laws of the State in which committed. * * *"

The statute fits Mahler's behavior like a glove. It is not for this court, by some sort of semantic gymnastics, to conclude that the Congress did not mean what it has so plainly said.

### 4. *Did the belated entry of a written order denying a motion to suppress evidence prejudice Mahler?*

■ About 6 weeks before the trial, a motion to suppress the evidence seized during the course of the search was heard. The judge and the parties had copies of the affidavit supporting the warrants, the inventories made by the searching officers, and the warrants. The originals were not available. Mahler stated that he was "ready to proceed on the basis as though these were the originals" except that he had not seen the face sheets for the affidavits. Evidence was then received, the judge indicating that he would delay decision until the originals were received. At the conclusion of the hearing, the judge said that if the copies he had before him were correct, he would deny the motion, and that when he received the originals, he would deny the motion without further hearing if the copies were correct. This was agreed to. However, a formal order denying the motions was not filed until one week after the trial.

At trial, no point was made of the fact that an order had not been entered. Nor does Mahler now claim that the copies were in any way inaccurate. The irregularity is harmless.

### 5. *Was Mahler deprived of counsel?*

■ When he was arraigned, Mahler asked for counsel. He testified that he had $1500 in the bank, three cars worth $1400, and a speculative interest in property of a potential value of $18,000. The court ruled that it "could not find you financially unable to provide your own attorney," and gave Mahler time to get one. The arraignment was continued for a week. At that time Mahler announced "[a]t this point I elect to proceed without counsel" and pled not guilty. At the hearing of the motion to

suppress, he also represented himself. After some discussion, Mahler said that there had been no change in his financial situation, and that he would rather proceed without an attorney.

On the day before trial, Mahler told the trial judge he was unable to employ counsel. Under oath, he said that he had only $475, that he had lost the property interest, and that the titles to his cars were "tied up." Here is what next occurred:

"THE COURT: In light of the showing I am going to appoint Mr. John Lindberg with the understanding Mr. Lindberg will not have responsibility for trying the case but will be available for advice and consultation only. Is that agreeable, Mr. Lindberg?

MR. LINDBERG: Do I understand, if the Court please, this case is scheduled for trial—?

THE COURT: Tomorrow morning. Mr. Mahler is a lawyer. He is admitted to the bar of Georgia he tells me and he has been handling his case ever since the return of the indictment. This morning he apprised me that he wanted the assistance of counsel, he was financially unable to get counsel, I told him I would undertake to get him someone on a consultive basis but not with responsibility of trying the case.

MR. LINDBERG: I take it that is satisfactory with Mr. Mahler?

MR. MAHLER: Yes, it is.

THE COURT: Very well.

MR. LINDBERG: Yes, Your Honor. Do I understand further that insofar as all questioning, including voir dire of the jury, the preparation of any instructions that might be necessary as well as the questioning of witnesses?

THE COURT: That would be Mr. Mahler's, his own task and if he has some questions about practice or if you should observe that there is something he is doing improperly that would help him do correctly you might furnish that advice, but you

will not be called upon to get into the trial of the case.

MR. LINDBERG: Very well.

THE COURT: Is that understood, Mr. Mahler?

MR. MAHLER: That is understood."

In the light of the foregoing, we cannot say that Mahler was unlawfully deprived of counsel. As a matter of fact, he tried the case rather well.

Affirmed.